## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| PETER ANTHONY CANTU, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | H-07-CV-3016 |
| | § | |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Peter Anthony Cantu ("Cantu"), a Texas inmate, seeks federal habeas corpus relief. In 1994, a jury convicted Cantu for the capital murder of Jennifer Ertman. After a separate punishment hearing, the jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence. After unsuccessfully exhausting his state court remedies, Cantu has filed a federal habeas corpus petition raising twelve grounds for relief. This action comes before the Court on Respondent Nathaniel Quarterman's answer and motion for summary judgment. (Doc. Entry No. 12.) Having reviewed the record, the pleadings, and the law – particularly the operation of the Anti-Terrorism and Effective Death Penalty Act's ("AEDPA") deferential standards – the Court concludes that Cantu is not entitled to habeas corpus relief.

## I. BACKGROUND

Cantu was arrested and charged with capital murder in 1993. Five members of the Black and White gang – Cantu, Jose Medellin, Derrick Sean O'Brien, Efrian Perez, and Raul Villareal – received death sentences for their role in the rape and murder of fourteen-year-old Jennifer Ertman and sixteen-year-old Elizabeth Pena. Cantu's federal habeas claims require the Court to discuss the

particulars of the murders.  Several courts have already provided a detailed factual review.  *See Medellin v. Texas*, --- U.S. ---, 128 S. Ct. 1346 (2008); *O'Brien v. Dretke*, 156 F. App'x 724, 726-28 (5th Cir. 2005); *O'Brien v. Dretke*, 4:02-CV-1865 (S.D. Tex. Jan. 13, 2005); *Perez v. Cockrell*, 77 F. App'x 201, 202-03 (5th Cir. 2003); *Medellin v. Cockrell*, No. H-01-4078, 2003 WL 25321243 (S.D. Tex. June 25, 2003); *Villareal v. Cockrell*, No. H-02-1975 (S.D. Tex. Feb. 14, 2003); *Cantu v. State*, 939 S.W.2d 627, 631-32 (Tex. Crim. App. 1997).[1]  Given the exhaustive prior summaries of the crime the Court will recite only briefly the factual narrative.

On June 24, 1993, members of the Black and White gang met to initiate Raul Villareal into their group.  The teenagers congregated near a railroad trestle to "fight in" Villareal.  Gang members fought Villareal in turn.  Aside from the above-mentioned gang members, Roman Sandoval, Frank Sandoval, and Venancio Medellin were also present at the gang initiation.  After several gang members fought Villareal, the group started drinking.

Unfortunately, as they took a shortcut home, Ms. Ertman and Ms. Pena came upon the gang at around 11:30 p.m.  Roman Sandoval and Frank Sandoval were leaving as the girls neared the other gang members.  The Sandoval brothers testified at trial that Medellin and Cantu forced the girls to the ground.  The remaining gang members then began a savage sexual assault.  Fourteen-year-old Venancio Medellin was present at the crime, participated in raping the girls, and testified at trial about each gang member's involvement in the sexual assault and killing.  Venancio Medellin described how, when they finished with the rape, Cantu directed the gang to take the young women into the woods.  There, the gang members strangled the girls with their hands, shoelaces, and a belt.

---

[1]  While Cantu, Jose Medellin, O'Brien, Perez, and Villareal all received death sentences, Perez and Villareal had their sentenced commuted to life imprisonment pursuant to *Roper v. Simmons*, 543 U.S. 551 (2005), because they were minors when they participated in the killings.  Texas has already executed O'Brien and Medellin.

When Ms. Pena was nearly lifeless, Cantu kicked her in the mouth with his steel-toed boots. He and his fellow gang members also stood on the young girls' necks to ensure that they would die.

After the murders, the gang members went to Cantu's house. They bragged to Cantu's brother and sister-in-law about their crime. While Cantu was not particularly talkative, he agreed with the statements made by the other gang members. Days later, Cantu's brother and sister-in-law reported what they had heard to the police. The police, previously unable to find the young girls, used that information to find their bodies. Insect activity, animal degradation, and the sweltering heat left the corpses unrecognizable. Maggots swarmed about their bodies, particularly in the bloodied head and genital regions. While flesh remained elsewhere, no skin remained on either girl's skull by the time the police recovered the bodies. Cantu now bases a significant portion of his habeas petition on the argument that the jury should not have seen photographs of the girls' corpses.

The police arrested the gang members simultaneously. After being informed of and waiving his constitutional rights, Cantu provided two written statements. In his initial statement, Cantu reluctantly admitted to a limited role in raping and stealing from the girls. He was silent about their deaths. When the police informed him that O'Brien confessed, Cantu provided the following statement relating his role in the murders:

> . . . [W]e rapped [*sic*] them. We had sex with them. We were taking turns having sex with them. Then it was time to go.
>
> After we took them into the woods Joe [Medellin] started to strangle the brunette [Ms. Pena] with his hands. Raul [Villareal] or Sean [O'Brien] started to strangle the blond [Ms. Ertman]. Efrian [Perez] started to help. Joe [Medellin] strangled the brunette, that's when I kicked her once in the face. Joe [Medellin] had her from behind, sitting on the ground strangling her with his hands when I kicked her in the face. When she dropped to her back we checked for a pulse. I then went to check on Sean [O'Brien] and Raul [Villareal] who were with the blond girl. They had already strangled her and she was laying on her back. She was still moving slightly

3

and that's when I placed my left foot across her throat and placed some pressure on it for a few seconds. When I took my foot off, I believe it was Sean [O'Brien] that placed his foot on her throat. We did this to make sure that they were dead. We didn't want to be identified.

Tr. Vol. 24 at 932-33; Tr. Vol. 31, SX 6.[2] Cantu filed a pre-trial motion to suppress his confessions. Because he provided no evidence of constitutional overstepping by the police, both of Cantu's full statements came before the jury.

The State of Texas charged Cantu with the capital murder of Jennifer Ertman during a kidnapping, robbery, or aggravated sexual assault. Clerk's Record at 15. Donald R. Davis and Robert Morrow represented Cantu at trial.[3] The State of Texas prosecuted Cantu and his four fellow gang members simultaneously but in separate trials. The jury instructions allowed for Cantu's conviction either as a principal actor or as a party to the offense. Clerk's Record at 268-69. A jury convicted Cantu of capital murder. Clerk's Record at 276. After the presentation of testimony and evidence in a separate punishment phase, the jury answered Texas' special issue questions:

### Special Issue No. 1
Is there a probability that the defendant, Peter Anthony Cantu, would commit criminal acts of violence that would constitute a continuing threat to society?

### Special Issue No. 2
Do you find from the evidence beyond a reasonable doubt that Peter Anthony Cantu, the defendant himself, actually caused the death of Jennifer Ertman, the deceased, on the occasion in question, or if he did not actually cause Jennifer Ertman's death, that he intended to kill Jennifer Ertman or another, or that he anticipated that a human life would be taken?

---

[2]    The state court records consist of a Clerk's Record that contains pretrial motions, trial court orders, jury instructions, and other pleadings, cited as "Clerk's Record at ___"; a 32-volume Statement of Facts, including hearings on pretrial motions, jury voir dire, the guilt/innocence phase, and the penalty phase, cited as "Tr. Vol. ___ at ___"; and a transcript of the state habeas proceedings, cited as "State Habeas Record at ___."

[3]    For convenience, the Court will generally refer to Cantu's attorneys collectively as "trial counsel."

Special Issue No. 3

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character or background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?  You are instructed that the term "mitigating evidence" or "mitigating circumstances" means evidence that a juror might regard as reducing the defendant's moral blameworthiness.

The jury need not agree on what particular evidence supports an affirmative finding on this Special Issue.

Clerk's Record 287-89.  The jury's answers to the special issues required the trial court to impose a death sentence.

Cantu unsuccessfully challenged his conviction and sentence on direct appeal and state habeas review.  This federal habeas action follows.  Cantu's federal habeas petition raises twelve interrelated claims that the Court summarizes as follows:

- The Constitution allows a capital jury to consider the parole implications that accompany a life sentence (claims one through six).

- The trial court failed to sustain an objection to the prosecution's penalty phase argument that improperly limited the jury's consideration of Cantu's mitigating evidence (claim seven).

- Texas' method of placing mitigating evidence before the jury limited the jury's ability to give effect to that evidence (claim eight).

- The trial court violated the Constitution by refusing to instruct the jury on lesser-included offenses (claim nine).

- Cantu's trial and appellate attorneys provided ineffective assistance by not limiting the jury's exposure to photographs and video of the victims' decomposing bodies (claims ten through twelve).

Cantu exhausted each of his claims in state court.  Respondent has filed a motion for summary judgment arguing that Cantu's claims do not merit federal habeas corpus relief.  This case is ripe for adjudication.

5

## II. LEGAL STANDARDS

Federal law authorizes this Court to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Constitution honors the writ of habeas corpus as "a vital instrument for the protection of individual liberty[.]" *Boumediene v. Bush*, --- U.S. ---, 128 S. Ct. 2229, 2246 (2008). Federal courts and Congress, however, "adjust the scope of the writ in accordance with equitable and prudential considerations." *Danforth v. Minnesota*, --- U.S. ---, 128 S. Ct. 1029, 1040 (2008). Statutory and judicial principles ensure that "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Additionally, federal habeas proceedings honor the "presumption of finality and legality [that] attaches to [a petitioner's] conviction and sentence." *Id.*

The AEDPA gives statutory effect to traditional limits on habeas review. "Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and to further the principles of comity, finality, and federalism[.]" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quotation and citation omitted). The AEDPA requires federal deference to both legal determinations and fact findings made by state courts.

### A.    The AEDPA

The AEDPA forbids habeas relief on issues "adjudicated on the merits" in state court unless the state decision "was contrary to, or an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented

in the State court proceeding." 28 U.S.C. § 2254(d). The Supreme Court holds that a state court decision is "contrary to" federal precedent when the state court arrives at a conclusion "opposite to that reached by [the Supreme Court] on a question of law" or "the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002). A state court unreasonably applies federal law when it "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the particular facts of the particular state prisoner's case" or when "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. The AEDPA also rigorously defers to state findings of fact unless a petitioner presents clear and convincing evidence in rebuttal. *See* 28 U.S.C. § 2254(e)(1).

A petitioner's compliance with the AEDPA alone does not entitle him to habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (remarking that no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). Other judicial doctrines, such as the harmless-error doctrine and the non-retroactivity principle, bridle federal habeas relief. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). This Court cannot issue the writ unless the error "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it

7

is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome."). A habeas court likewise cannot grant relief if it would require the creation and retroactive application of new constitutional law. *See Horn*, 536 U.S. at 272 (relying on *Teague v. Lane*, 489 U.S. 288 (1989)).

**B.     Summary Judgment**

Respondent has moved for summary judgment. Summary judgment is proper when the record shows "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In ordinary civil cases, a district court considering a motion for summary judgment must construe disputed facts in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). However, a court on summary judgment must view the evidence through "the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254. Congress, through the AEDPA, has constricted both the nature and availability of habeas review. This Court, therefore, applies general summary judgment standards only insofar as they do not conflict with the language and intent of the AEDPA. *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) ("[Rule 56] applies only to the extent that it does not conflict with the habeas rules."), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004). Accordingly, where the state courts have resolved factual allegations by express or implicit findings, federal courts construe facts in a prisoner's favor only after he has shown that the findings are incorrect under 28 U.S.C.

§ 2254(e)(1).

### III.  ANALYSIS

**A.      Jury Consideration of Future Parole Eligibility (claims one through six)**

Cantu's first six claims challenge the trial court's refusal to inform his jury about Texas

parole law.  At the time of Cantu's trial, a Texas capital defendant who received a life sentence

would become eligible for parole after 35 years of incarceration.  TEX. CRIM. PROC. art. 42.18

§ 8(b)(2) (1991).  Texas law, however, then prohibited any information about potential parole

eligibility from coming before the jury. *See* TEX. CODE CRIM. PROC. art. 37.07, § 4(a) (West 1993).

Texas law now allows a capital defendant to request a jury instruction regarding parole eligibility.

*See* TEX. CODE CRIM. PROC. art. 37.071(e)(2)(b) (Vernon 2002).  Cantu contends that the former

prohibition on parole-eligibility information rendered his defense ineffectual.

Trial counsel sought a favorable answer to the future dangerousness special issue by showing

that: (1) Cantu would not be dangerous while incarcerated; (2) with the passage of time he would

mature and become less violent; and (3) when he became eligible for parole after 35 years he would

not pose a threat to society.  Cantu's attorneys adduced testimony that supported the first two

propositions.  Cantu now claims that the trial court violated the Constitution by limiting his ability

to support the third argument, that he would not be violent if he became eligible for parole after a

lengthy imprisonment.

Before trial, Cantu wanted to discuss Texas parole law with potential jurors.  The prosecution

filed a motion in limine asking the trial court to preclude "any direct or indirect reference

whatsoever" to Texas parole law.  Clerk's Record at 278.  The trial court initially prevented the

defense only from claiming that "if [Cantu] receives a life sentence he will spend the rest of his life

9

in prison and never be released on parole." Clerk's Record at 278-79. The trial court did not allow any voir dire discussion of potential parole eligibility. Tr. Vol. 20 at 95. During the punishment phase, the trial court prohibited the defense from asking an expert witness about the parole eligibility that accompanies a life sentence. Tr. Vol. 28 at 693-95. Cantu also unsuccessfully requested a jury instruction on parole. Tr. Vol. 28 at 698-99. The jury instructions followed Texas law and cautioned the jury not to speculate on parole during deliberations. Clerk's Record at 286 ("During your deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice or of the Governor, or how long the defendant would be required to serve to satisfy a sentence of life imprisonment.").[4] Cantu complains that the absence of correct information about parole law left his defense theory incomplete and ineffectual. Cantu asserts that the Due Process Clause (claim one), the Eighth Amendment protection against Cruel and Unusual Punishment (claim two), and the Sixth Amendment's Compulsory Process Clause (claim three) required Texas to inform its capital juries about the operation of Texas' parole law. Cantu additionally complains that, because other capital inmates – including some of his co-perpetrators – have had trials wherein the jury received information about parole eligibility, various constitutional theories including the Equal Protection Clause entitled him to that information also (claims four through six). The Court of Criminal Appeals rejected Cantu's

---

[4]        Respondent claims that, although the trial court would not instruct the jury on the operation of Texas parole law, "the jury knew that a life sentence meant he would be eligible for parole after serving thirty-five years." (Doc. Entry No. 12 at 11.) Trial comments about parole law, however, were vague. For instance, trial counsel asked Dr. James W. Marquart, a professor of Criminal Justice at Sam Houston University, if "studies indicate that the defendant who serves thirty-five calendar years in the Texas Department of Corrections before becoming eligible is less violent than the inmate who is paroled earlier." Tr. Vol. 28 at 664. Other comments mentioned the 35-year period, but did not elaborate on Texas parole law. See Tr. Vol. 28 at 666-67, 673, 770, 793. While the jury may have been able to infer that Cantu could not have been paroled before the end of that period, Texas law hindered him from fully explaining parole ineligibility to the jury. The trial court's instruction prevented the jury from giving any effect to the parole inferences before the jury.

arguments both on direct appeal and on habeas review.

While Cantu mentions several constitutional bases for these claims, he does not elaborate on each constitutional theory. Instead, Cantu bases his claims on *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994), which held that when "the alternative sentence to death is life without parole . . . due process plainly requires that [the defendant] be allowed to bring [parole ineligibility] to the jury's attention by way of argument by defense counsel or an instruction from the court." The *Simmons* court reasoned that, when a State imposes the death penalty on the premise that the convicted individual poses a danger to society, the fact that the defendant may receive life without the possibility of parole "will necessarily undercut the State's argument regarding the threat the defendant poses to society." *Id.* This reasoning prevents a "false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant will never be released on parole." *Id.* at 171.

Cantu seeks to extend *Simmons* to Texas' former sentencing statute. *Simmons*, however, only applies to a capital sentencing scheme that provides for life without the possibility of parole. In *Simmons*, the Supreme Court cautioned that "[i]n a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative[.]" 512 U.S. at 168. For that reason, the *Simmons* Court stated that it will "not lightly second-guess a decision whether or not to inform a jury of information regarding parole." *Id.* The *Simmons* Court "expressly held that its ruling did not apply to Texas, because it does not have a life-without-parole alternative to capital punishment." *Tigner v. Cockrell*, 264 F.3d 521, 525 (5th

Cir. 2001) (citing *Simmons*, 512 U.S. at 168 n.8).[5]

Texas inmates have offered various arguments in trying to apply *Simmons* to Texas' former capital procedure.  The Supreme Court has not, however, extended the *Simmons* holding beyond "when, assuming the jury fixes the sentence at life, the defendant is ineligible for parole under state law."  *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000).  The Fifth Circuit has consistently and unconditionally ruled that *Simmons*' due process holding did not require Texas to inform its juries of a defendant's future parole eligibility.  *See Thacker*, 396 F.3d at 617-18; *Elizade v. Dretke*, 362 F.3d 323, 332-33 (5th Cir. 2004); *Woods v. Cockrell*, 307 F.3d 353, 360-62 (5th Cir. 2002); *Johnson v. Cockrell*, 306 F.3d 249, 256-57 (5th Cir. 2002); *Collier v. Cockrell*, 300 F.3d 577, 583 (5th Cir. 2002); *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir. 2001); *Wheat v. Johnson*, 238 F.3d 357, 361-62 (5th Cir. 2001); *Miller v. Johnson*, 200 F.3d 274, 290-91 (5th Cir. 2000); *Hughes v. Johnson*, 191 F.3d 607, 617 (5th Cir. 1999); *Muniz v. Johnson*, 132 F.3d 214, 224 (5th Cir. 1998); *Montoya v. Scott*, 65 F.3d 405, 416 (5th Cir. 1995); *Allridge v. Scott*, 41 F.3d 213, 222 (5th Cir. 1994); *Kinnamon v. Scott*, 40 F.3d 731, 733 (5th Cir. 1994).  The Fifth Circuit has also rejected the other constitutional theories upon which Cantu relies, to wit: the Compulsory Process Clause, *Gomez v. Quarterman*, 529 F.3d 322, 335 (5th Cir. 2008); *Thacker*, 396 F.3d at 617-18; the Cruel and Unusual Punishment Clause, *Nealy v. Dretke*, 172 F. App'x 593, 597 (5th Cir. 2006); *Thacker*, 396 F.3d at 617; *Rudd*, 256 F.3d at 320-21; and the Equal Protection Clause, *Tigner*, 264 F.3d at 525-26; *Collier*,

---

[5]     In 2005, Texas revised its capital sentencing statute.  Capital defendants in Texas state court now face two possible sentences: (1) the death penalty or (2) a sentence of life imprisonment without the possibility of parole. TEX. CODE CRIM. PRO. art. 37.071 § 2(g).

12

300 F.3d at 585-86; *Green v. Johnson*, 160 F.3d 1029, 1044 (5th Cir. 1998).[6]

Cantu seeks to distinguish Supreme Court and Fifth Circuit precedent by arguing that "[j]urors who are informed that a defendant will not be eligible for parole at all, or will be ineligible for a certain fixed term, assures that jurors will not mistakenly speculate that the defendant might be released into free society at an earlier time than the law permits." (Doc. Entry No. 2 at 13.) Clearly established Supreme Court precedent applies *Simmons* "only to instances where, *as a legal matter*, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Ramdass*, 530 U.S. at 169 (emphasis added). The possibility of parole, not the timing thereof, exempted Texas from the *Simmons* requirement. Cantu has not shown that the trial court erred by refusing to instruct his jury on the operation of Texas parole law.[7]

---

[6]       Cantu complains that, the law discussed above notwithstanding, this Court should find constitutional error because other Texas capital juries received information about parole eligibility. In particular, Cantu alleges that "[a]t least two of [his] co-defendants were afforded in separate trials, the benefit of an instruction like the one Cantu was denied." (Doc. Entry No. 2 at 12.) Cantu complains that the Equal Protection Clause should have allowed the same information to come before his jury. That some defendants received more than the Constitution requires does not mean the omission of the information was error in Cantu's case.

[7]       Cantu premises his argument on the assumption that a jury's knowledge of parole eligibility will inure to the benefit of the defense. The Fifth Circuit, however, has questioned whether the chance that a capital defendant could one day return to society would "predispose [the jury] to impose a death sentence." *Woods v. Johnson*, 75 F.3d 1017, 1037 (5th Cir. 1996) (quotation omitted). Here, the Court of Criminal Appeals summarized the evidence showing that Cantu would pose a future danger as follows:

          .... Appellant, along with his co-defendants, brutally raped, strangled, and stomped the two girls to death. Evidence at trial also tended to show appellant was the leader of the gang that committed this crime, and this evidence rebutted any implication he acted under duress or the domination of another at the time of the offense. Several witnesses testified appellant had a history of violent behavior and offenses. Evidence at trial showed appellant's actions with respect to this offense were of a calculated and deliberate nature.

*Cantu*, 939 S.W.2d at 642. The Court of Criminal Appeals emphasized the facts of the murders because it has long held that "if the offense was shown to be sufficiently cold-blooded or calculated, then the facts of the offense alone may support a finding that the defendant will pose a continuing threat to society." *Kunkle v. State*, 771 S.W.2d 435, 449 (Tex. Crim. App. 1986). In addition, the Court of Criminal Appeals listed the following extraneous offenses committed by Cantu: (1) "st[ealing] a bicycle from an eight-year-old and then turn[ing] it in for a reward"; (2) "threaten[ing] a woman and br[eaking] a window at her home"; (3) "attack[ing] a sixth grade teacher"; (4) "threaten[ing] another student's father, (continued...)

On both direct appeal and state habeas review, the state courts found no constitutional error in preventing the jury from speculating on the possibility of parole. *Cantu*, 939 S.W.2d at 632; State Habeas Record at 257.  Although federal law on this issue is not altogether coherent, the state courts' rejection of Cantu's claims was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  Additionally, because no federal law required Texas to inform its juries of a capital defendant's parole eligibility, establishing such a rule on federal habeas review would require the creation of new constitutional law.  *Teague v. Lane*, 489 U.S. 288 (1989), thus bars relief on these claims.  *See Wheat*, 238 F.3d at 361 (finding any extension of *Simmons* to violate *Teague*); *Clark v. Johnson*, 227 F.3d 273, 282 (5th Cir. 2000) (same); *Boyd v. Johnson*, 167 F.3d 907, 912 (5th Cir. 1999) ("Relief based on *Simmons* is foreclosed by *Teague*.").  Federal precedent and *Teague*'s non-retroactivity provision preclude relief on Cantu's first six grounds for relief.

**B.      Jury Consideration of Mitigating Evidence (claims seven and eight)**

Cantu raises two claims related to the jury's consideration of his mitigation defense.  During the punishment phase of trial, Cantu claimed that he was less culpable because of a learning disorder, depression, and emotional issues.  Cantu claims that Texas' method of placing mitigating evidence before the jury insufficiently allowed the jury to consider him worthy of a life sentence (claim eight). Additionally, Cantu claims that the prosecution's penalty phase argument compounded the structural

---

[7]      (...continued)

saying that he wanted to kill him"; (5) "creat[ing] problems in school by fighting and cursing"; (6) threaten[ing] to kill an officer of the law"; and (7) "ma[king] threats at a hospital and in jail."  *Id.* at 642 n.11.  The Court of Criminal Appeals' review did not include the aggravated assault with a deadly weapon charge that resulted in Cantu receiving four years of deferred adjudication probation.  While the violence Cantu exhibited in raping and killing the young victims supported the jury's answers to the future dangerousness issue, his prior acts were not of the same extreme nature as the crime for which he was convicted.  Nevertheless, the Fifth Circuit rejected a similar claim by Cantu's co-perpetrator Jose Medellin whose prior violence was similarly eclipsed by the acts of June 24, 1993.  The Fifth Circuit noted that "pointing out to the jury that [Medellin] would be eligible for parole at age 53 could not conceivably have changed [the jury's] determination that [he] posed a future danger."  *See Medellin v. Dretke*, 371 F.3d 270, 277 (5th Cir. 2004) (citing *Woods v. Johnson*, 75 F.3d 1017, 1037 (5th Cir. 1996) and *King v. Lynaugh*, 850 F.2d 1055, 1060 (5th Cir. 1988)).

14

problems in Texas law, further limiting the jury's ability to act on his mitigating evidence (claim seven).

The importance of mitigating evidence in capital trials cannot be gainsaid. "Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment." *Riley v. Cockrell*, 339 F.3d 308, 316 (5th Cir. 2003) (citing *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999)). "[I]n order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances." *Jurek v. Texas*, 428 U.S. 262, 271 (1976) (plurality opinion); *see also Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976). "A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." *Jurek*, 428 U.S. at 271. A capital sentencing scheme must not preclude the jury "from considering, as a mitigating factor, any aspect of a defendant's character or record and of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion); *see also Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982).

However, the Supreme Court "has never held that jury discretion must be unlimited or unguided; [it has] never suggested that jury consideration of mitigating evidence must be undirected or unfocused; [it has] never concluded that States cannot channel jury discretion in an effort to achieve a more rational and equitable administration of justice." *Franklin v. Lynaugh*, 487 U.S. 164, 181 (1988) (plurality opinion). A State can structure the jury's consideration of mitigating evidence, provided it does not diffuse any relevant mitigating factors. *See Buchanan v. Angelone*, 522 U.S.

269, 276 (1998); *Boyde v. California*, 494 U.S. 370, 377 (1990). The Court must decide whether, by statute or in practice, Texas prevented Cantu's jury from giving effect to his mitigating evidence.

    *1.    Consideration of Mitigating Evidence Under Texas Law*

    Cantu claims that the language of Texas' statutorily authorized mitigation special issue impeded full jury consideration of his penalty-phase evidence. Cantu's claim invokes decades of jurisprudence involving Texas' method of placing mitigating evidence before capital juries. In 1972, the Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972), condemned death penalty statutes that gave the sentencer open-ended discretion. The *Furman* Court established that a state capital sentencing system must satisfy two requirements to be constitutionally acceptable: it must "rationally narrow the class of death-eligible defendants" and "permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 174 (2006). The Texas Legislature's renovation of its capital punishment scheme in the wake of *Furman* did not include a specific vehicle for the consideration of mitigating evidence. In *Jurek v. Texas*, 428 U.S. 262 (1976), the Supreme Court upheld the constitutionality of Texas's capital sentencing statute. The *Jurek* Court found that the constitutionality of the Texas scheme "turns on whether the enumerated [special issue] questions allow consideration of particularized mitigating factors." *Id.* at 272. The *Jurek* Court recognized that, while the then-existent Texas capital sentencing statute did not directly address a defendant's mitigating evidence, the Texas Court of Criminal Appeals interpreted the statute in a way that let a jury consider mitigating circumstances. *See id.* at 272-73.

    In 1989, however, the Supreme Court held that Texas' then-operative system did not always provide an effective vehicle for considering mitigating evidence. In *Penry v. Lynaugh*, 492 U.S. 302

(1989) ("*Penry I*"), the Supreme Court found that some elements of that defendant's mental retardation and child abuse evidence evaded the jury's specific inquiry under the special issues, particularly when that evidence (1) had a mitigating thrust that went beyond the deliberateness question and (2) became a "two-edged sword because the future dangerousness question only gave it aggravating effect." "In order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,'" *Penry I* held that "the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." *Id.* at 328 (quoting *Woodson*, 428 U.S. at 305).

After the *Penry I* decision in 1989, Texas did not hold a regular legislative session until 1991. Until the Texas state legislature could revise the capital sentencing scheme to comply with *Penry I*, courts attempted to correct the statutory inadequacy through jury instructions. These stopgap instructions – often called nullification instructions – required the jury to answer the statutory special issues in the negative if sufficient mitigating circumstances existed.[8]

In 1991, the Texas Legislature added a statutory special issue that explicitly required the jury to consider a defendant's mitigating evidence:

---

[8]    The stopgap instructions given by the Texas courts generally informed the jury:

> You are instructed that when you deliberate on the questions posed in the special issues, if any, are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability, at the time you answer the special issue. *If you determine when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding on the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, then a negative finding should be given to that special issue under consideration.*

*Smith v. Dretke*, 422 F.3d 269, 285 n. 6 (5th Cir. 2005) (emphasis added).

17

The court shall instruct the jury that if the jury returns an affirmative finding to each issue . . . it shall answer the following issue:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(1); Clerk's Record at 289. Texas law defined mitigating circumstances as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX. CODE CRIM. PROC. art. 37.071 § 2(f)(4). The trial court included Texas' explicit mitigation special issue in the instant case.

After 1991, capital inmates fell into three categories: (1) pre-*Penry* defendants whose juries were not explicitly told to consider mitigating evidence; (2) defendants sentenced between 1989 and 1991 whose juries received the nullification instruction; and (3) defendants whose juries received an explicit statutory special issue. Significant jurisprudence dealt with the constitutional issues in the first category. Nothing in *Penry I* signaled a wholesale rejection of Texas' special issues, yet the Supreme Court failed to articulate how to determine what evidence evaded Texas' sentencing review. Eventually, the *en banc* Fifth Circuit in *Graham v. Collins*, 950 F.2d 1009 (5th Cir. 1992), *aff'd* 506 U.S. 461 (1993), outlined a "constitutional-relevancy test" that it would apply to all capital trials where the jury received no directive to consider mitigating evidence.[9] As an integral component of the Fifth Circuit's test, a defendant had to demonstrate a "nexus" between the mitigating evidence and the special issues. *See Harris v. Johnson*, 81 F.3d 535, 539 (5th Cir. 1996);

---

[9] The Fifth Circuit found special support because the Supreme Court affirmed the formative *Graham* case in establishing its *Penry* law and distinguished *Penry I* in subsequent cases. The Fifth Circuit long relied on *Johnson v. Texas*, 509 U.S. 350 (1993), and *Graham v. Collins*, 506 U.S. 461 (1992), to deny relief in *Penry* cases.

18

*Turner v. Johnson*, 106 F.3d 1178, 1189 (5th Cir. 1997). In other words, the Fifth Circuit's constitutional-relevance test looked for a relationship between the mitigating evidence and a defendant's culpability, granting relief only if some aspect of the evidence transcended the jury's role in answering the special issues.

In 2004, however, the Supreme Court rejected the Fifth Circuit's constitutional-relevancy test as a "restrictive gloss on *Penry I*." *Tennard v. Dretke*, 542 U.S. 274, 283 (2004). The *Tennard* court found that the Fifth Circuit's precedent "ha[d] no foundation in the decisions of [the Supreme] Court." *Id.* at 284; *see also Smith v. Texas*, 543 U.S. 37, 43-44 (2004). Instead, the Supreme Court held that a jury must have before it an effective vehicle to consider anything meeting a "low threshold for relevance," that is, "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard*, 542 U.S. at 284-85. In the wake of *Tennard*, the Supreme Court and Fifth Circuit have found error in most pre-1989 cases, with limited exceptions. *See, e.g, Brewer v. Quarterman*, --- U.S. ---, 127 S. Ct. 1706, 1713-14 (2007); *Abdul-Kabir v. Quarterman*, --- U.S. ---, 127 S. Ct. 1654, 1664-75 (2007); *Nelson v. Quarterman*, 472 F.3d 287, 292-314 (5th Cir. 2006); *but see Smith v. Quarterman*, 515 F.3d 392, 412 (5th Cir. 2008).

With respect to those convictions between 1989 and 1991, the Supreme Court ultimately rejected Texas' stopgap instructions. In *Penry v. Johnson*, 532 U.S. 782, 804 (2001) ("*Penry II*"), the Supreme Court found that the supplemental mitigating instructions given before 1991 amounted to an "ineffective and illogical" mechanism for giving effect to mitigating evidence.

Against this backdrop, Cantu accuses Texas of perpetuating *Penry* error after the legislative renovation in 1991. Cantu asserts that Texas' current mitigation special issue still inadequately puts

19

mitigating evidence before the jury (claim 8).  Cantu claims that the prosecution in his case compounded the statutory deficiencies by asking the jury to weigh his evidence in a manner similar to the Fifth Circuit's rejected constitutional-relevancy test (claim 7).  The Court must decide whether "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990); *see also Waddington v. Sarausad*, --- U.S.---, --- S. Ct.---, 2009 WL 129033, at *8 (Jan. 21, 2009) (reaffirming the *Boyde* standard and noting the "especially heavy burden on a defendant who . . . seeks to show constitutional error from a jury instruction that quotes a state statute").

> 2.      *Structural Error in Texas' Mitigation Special Issue*

Cantu claims that Texas still unconstitutionally limits a jury's consideration of mitigating evidence. Cantu acknowledges that Texas juries now explicitly take into account "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant."  TEX. CODE CRIM. PRO. art. 37.071 § 2(e)(1).  However, Cantu objects that the instruction unnecessarily confined the jury's review to "evidence that a juror might regard as reducing the defendant's moral blameworthiness."  TEX. CODE CRIM. PRO. art. 37.071 § 2(f)(4). According to Cantu, that language allows jury consideration of evidence relating to his culpability at the exclusion of additional aspects of his character.  Cantu, therefore, argues that the Texas statute still requires a nexus between the crime and the mitigating evidence in the same manner as the discredited constitutional-relevancy test.

Cantu emphasizes that the State must afford the jury a vehicle to consider "*any* aspect of the defendant's character proffered as a basis for the imposition of a sentence less than death." (Doc. Entry No. 2 at 27.)  A jury's consideration of mitigating evidence, while essential to fair sentencing,

20

is not without bounds, limits, or demarcation.  A State must "permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Marsh*, 548 U.S. at 174.  The Supreme Court, however, has never required the States to conform to only one method of considering mitigating evidence.  *See Franklin*, 487 U.S. at 179.  "[T]he state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998); *see also Franklin*, 487 U.S. at 179. The question is whether Texas' definition of mitigating evidence inhibits mitigation review.

The Fifth Circuit has held that Texas' current definition of mitigating evidence "encompasses 'virtually any mitigating evidence.'" *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007) (quoting *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001)); *see also Jackson v. Dretke*, 181 F. App'x 400, 412 (5th Cir. 2006); *O'Brien*, 156 F. App'x at 735.  In rejecting similar claims, the Fifth Circuit has emphasized that Texas courts interpret the statute broadly, holding that "*all* mitigating evidence can be given effect" under the definition. *Beazley*, 242 F.3d at 260.  The Fifth Circuit has held that the use of the term "moral blameworthiness" does not prevent the jury from considering mitigating circumstances because "[v]irtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability'" apart from the concerns identified in the other special issues. *Id.* (quoting *Graham*, 506 U.S. at 476).

No clearly established Supreme Court precedent calls the Texas statute into question. "Far from rejecting the current scheme regarding mitigation, . . . the Supreme Court [has] implicitly endorsed it" in *Penry II*. *Oliver v. Quarterman*, 254 F. App'x 381, 387 (5th Cir. 2007).  In *Penry II*, when striking down Texas' former sentencing scheme, the Supreme Court called the new statute

"[a] clearly drafted catchall instruction on mitigating evidence" and a model of "brevity and clarity."
*Penry II*, 532 U.S. at 802.   The Supreme Court itself has broadly used the term "moral
blameworthiness" to describe that which a jury considers in effectuating the mitigation inquiry.  *See*
*Schriro v. Landrigan*, --- U.S. ---, 127 S. Ct. 1933, 1954 (2007); *South Carolina v. Gathers*, 490 U.S.
805, 818 (1984).   Specifically, the Supreme Court has used the term to describe how a jury gives
effect to good character evidence that is not "directly relevant" to the crime.  *Gathers*, 490 U.S. at
818.  Supreme Court case law does not suggest that Texas' current vehicle for the consideration of
mitigating evidence is impermissibly narrow.   Rejecting a similar claim by one of Cantu's co-
defendants, the Fifth Circuit noted that "the trial court's instructions taken alone, allowed the jury
to consider and give effect to" the mitigating evidence presented at trial.  *O'Brien*, 156 F. App'x at
736.

Cantu, like his co-defendant, offers no persuasive showing that constitutional error crept into
the jury instructions or somehow prevented consideration of his mitigation evidence.   Nothing in
federal precedent indicates that Texas' current means of putting mitigating evidence before the jury
violates the Constitution.  The Court of Criminal Appeals' rejection of this claim was not contrary
to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

3.   *Prosecutorial Argument Concerning Mitigating Evidence*

Even though Texas' statutory framework inherently allows for the consideration of mitigating
evidence, "the context of the proceedings is relevant in determining whether the jury could
reasonably have given effect to the mitigating evidence."  *O'Brien*, 156 F. App'x at 736.  Cantu
summarizes the mitigating evidence he presented at trial as follows: "he suffered a learning disability
and severe dysthmia or depression, leading to his placement in special education classes and to

22

significant emotional disturbances in his daily life." (Doc. Entry No. 2 at 18.)  Cantu contends that

the jury could have found that he was "a young man of native good character, with great potential

to succeed, both in his interpersonal relationships and in a career, but who became frustrated,

withdrawn and belligerent as a teenager on account of his learning disability and speech problems,

and by the death of his grandfather." (Doc. Entry No. 2 at 24.)  Cantu claims that the prosecution

limited the jury's consideration of that evidence in much the same way as the Fifth Circuit's now-

discredited constitutional relevancy test.

Cantu bases this claim on the following interchange during closing arguments:

The State:        [I would] [l]ike to talk to you briefly about the issue of mitigation[.]
                  . . . Nowhere will you find the court instructing you that you have to
                  find any evidence that you've heard in this case mitigating. . . . [W]hy
                  do you consider mitigation . . . . that's because the courts allow you
                  to individualize the justice.  There might be a fact and circumstance
                  out there that cries out for mercy, cries out for you to give the person
                  some leniency and not give them the death penalty, and many of those
                  circumstances we discussed are very unique, severe cases of abuse,
                  severe mental disorders, retardation, perhaps the person was never
                  given the opportunity to learn right from wrong and the consequences
                  of his behavior.  Keep in mind that when you think in terms of what
                  is it that really compels our mercy and do you see it in this case?  A
                  little thing I would suggest is that you kind of go in the step number
                  one, you look to determine if there is any mitigation.  If there is the
                  mitigation, is it sufficient, sufficient to rise to the level that you want
                  to take this man, [Cantu] and show him some mercy.  Does it rise to
                  that level?   And then ask yourself another question.  *Is there a
                  connection between what they try to give you as mitigation, is there
                  connection between that and the crime itself, when you think of what
                  you discovered to possibly be mitigating?   Does that cause the
                  defendant's behavior?  Does it justify it?  Is there a link there and
                  correlation between what you've heard and what you saw happen on
                  June 24th, 1993?*

Mr. Morrow:       Excuse me[.] . . . Your Honor, we object to the suggestion that there
                  has to be a nexus between the mitigation and the returning of a
                  verdict which would result in a life sentence.

Trial court:     Overruled.

Tr. Vol. 28 at 32 (emphasis added). Cantu does not claim that the prosecution's statement itself requires federal habeas relief. This is so because "[i]n habeas corpus proceedings, [the Court] review[s] allegedly improper prosecutorial statements under a strict standard." *Dowthitt v. Johnson*, 230 F.3d 733, 755 (5th Cir. 2000). Indeed, "[a] prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases." *Ortega v. McCotter*, 808 F.2d 406, 408 (5th Cir. 1987) (quotation omitted). Instead, Cantu faults the trial court for not sustaining his objection to the prosecutor's comment. Invoking the Cruel and Unusual Punishment Clause and Due Process Clause, Cantu claims that the trial court effectively adopted the prosecution's statements by denying his trial counsel's objection.[10]

Although better practice would have been to strike the prosecutor's comment, federal precedent shows that it did not violate Cantu's constitutional rights. The State used substantially the same language when prosecuting O'Brien for his role in the Ertman/Pena murders. In that case, the prosecutor allegedly imposed "deliberate, constant limitations" on the jury's consideration of mitigating evidence by repeatedly "telling the jury there must be a connection between mitigating evidence and the charged crime." *O'Brien*, 156 F. App'x at 734. For example, in voir dire the prosecutor told jurors that "if there's something in a defendant's background that you didn't think was even connected to why he did what he did, then you might consider that as not sufficiently

---

[10]     Respondent asks this Court to apply *Teague*'s retroactivity bar to this claim because "the Supreme Court has only invalidated prosecutorial argument on the basis of the Eighth Amendment one time" in distinguishable circumstances. (Doc. Entry No. 12 at 15.) The Supreme Court has held that *Teague* is "[a] threshold question in every habeas case" and "if the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court must apply *Teague* before considering the merits of the claim." *Horn v. Banks*, 536 U.S. 266, 271 (2002). Here, *Teague* does not bar relief because Cantu also bases his claim on the Fourteenth Amendment's Due Process Clause which traditionally governs improper remarks made by prosecutors. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1981).

mitigating." *Id.*  Also, "in his closing argument, the prosecutor reiterated that a nexus between

possibly mitigating evidence and the crime was required[.]" *Id.* at 734.  On the basis of those and

other statements, O'Brien claimed on federal habeas review that the prosecutorial actions imposed

the defunct constitutional relevancy test on the jury.

The Fifth Circuit refused to grant a Certificate of Appealability from the district court's

denial of habeas relief in *O'Brien*.  The Fifth Circuit first noted that the jury instruction allowed full

consideration of the mitigating evidence and otherwise complied with constitutional requirements.

The Fifth Circuit then framed the constitutional issue: "In an instance where prosecutorial statements

allegedly influence a jury's interpretation of the statutory charge, the proper inquiry is whether there

is a reasonable likelihood that the jury has applied the instructions in a way that prevents it from

considering constitutionally relevant evidence." *Id.* at 736.  The Fifth Circuit concluded:

> . . . . In context, rather than arguing that the jury was precluded from considering
> these factors as mitigating circumstances, the prosecutor's statements could have
> been interpreted to mean that the jury should not consider the factors mitigating in
> O'Brien's case.  Even if the jury understood the prosecutor's statements to mean the
> former, we do not attribute to a prosecutor's comments the same force as instructions
> of the court.

*Id.* at 736.  Because the mitigation special issue allowed full review of the defendant's evidence, the

Fifth Circuit found that "[r]easonable jurists would not disagree that the prosecutor's statements were

not so pervasive as to overcome the presumption that jurors follow their instructions." *Id.* at 736-37.

If anything, the statements made in Cantu's case are less pervasive than those from O'Brien's trial.

The comment that Cantu objects to was fleeting and isolated, with no "evidence of an intent . . . on

the part of the State to deny [Cantu] a fair and impartial trial." *Cantu*, 939 S.W.2d at 633.[11]

As noted above, the jury had before it a sufficient vehicle which would allow full and complete consideration of Cantu's mitigating evidence. Even if the trial prosecutor encouraged the jury to consider Cantu's mitigating evidence in an improper manner, Cantu has not overcome the strong presumption that juries will follow their instructions. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions[.]"). Accordingly, Cantu has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## C.      The Absence of a Lesser-Included-Offense Instruction (claim nine)

The jury instructions in the guilt/innocence phase gave the jury only two options: convict Cantu of capital murder or acquit him. Cantu asked the trial court to instruct the jury on three lesser-included offenses: murder, sexual assault, and/or kidnapping. Tr. Vol. 24 at 942. The trial court refused to provide the jury with the requested instructions. Tr. Vol. 24 at 944. Cantu claims that the trial court violated his constitutional rights by not allowing for his conviction for less-serious offenses. In support of this claim, Cantu notes that he gave two statements to the police. In the first version, he admitted to a limited role in raping the girls. In the second version, he implicated himself in the rape and murder. Because his first statement to the police did not discuss the death of the two girls, Cantu argues that the jury could have viewed the evidence in a manner that exculpated him of capital murder.

In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court overturned a death sentence

---

[11]      Also, the Court of Criminal Appeals noted that the prosecution's statement was merely a "suggestion," and did not tell "the jury that they *must* find a nexus between the offense and the evidence offered as mitigation[.]" *Id.*

because the trial evidence allowed for the possibility of a non-capital conviction but the jury instructions placed the defendant in an all-or-nothing conundrum: if the jury thought he was guilty merely of a lesser offense, then they could only sentence him to death or acquit him.[12]  The *Beck* Court held that a State cannot "impose a blanket ban on lesser-included-offense instructions in capital cases.  Subsequent decisions by [the Fifth Circuit] have consistently held that a state trial court may not, under *Beck*, refuse a lesser-included-offense instruction if the jury could rationally acquit on the capital crime and convict for the noncapital crime." *East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995) (citation and quotation omitted); *see also Dowthitt*, 230 F.3d at 737 n.37 ("A state trial court may not . . . refuse a lesser-included offense instruction 'if the jury could rationally acquit on the capital crime and convict for the noncapital crime.'"); *Lincecum v. Collins*, 958 F.2d 1271, 1274-75 (5th Cir. 1992) (applying *Beck* when "a trial judge refuses to give an instruction which is available under state law").  To warrant the lesser-included-offense instruction, however, the evidence of the lesser crime must be of sufficient magnitude to allow a rational jury to convict him only for that offense.[13]

---

[12]      In *Beck*, "the jury [was] given the choice of either convicting the defendant of the capital crime, in which case it is required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime."  447 U.S. at 629.

[13]      Respondent asks this Court not to apply *Beck* to Cantu's claim because, unlike the defendant in that case, Cantu faced a situation where the jury chose between acquittal and a capital conviction, not acquittal and an automatic death sentence.  Under Respondent's reasoning, the separation of the conviction and sentencing decisions in Texas' capital punishment scheme diffuse the core concern of *Beck*: that a jury will impose a death sentence fearing that they would free a man guilty of a lesser crime.  Respondent assumes that Texas' bifurcated system (that was not present in *Beck*) allows a jury to give effect to any lingering doubt about guilt by delivering a capital conviction but a life sentence, avoiding *Beck*'s all-or-nothing conundrum.  Respondent's argument finds some support in Supreme Court precedent.  *See Howell v. Mississippi*, 543 U.S. 440, 445 (2005) (finding that similar reasoning by the Mississippi Supreme Court "finds some support in [Supreme Court] cases"); *Hopkins v. Reeves*, 524 U.S. 88, 98-99 (1998) (distinguishing *Beck* from those cases where the jury "did not have to consider the dilemma faced by Beck's jury; its alternative to death was not setting respondent free, but rather sentencing him to life imprisonment"); *Schad v. Arizona*, 501 U.S. 624, 646 (1991) ("Our fundamental concern in *Beck* was that a jury . . . might . . . vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all").  Because the Fifth Circuit, however, has

(continued...)

"In deciding whether a jury could rationally acquit on the capital crime and convict for the noncapital crime, [this Court] must turn to Texas law." *East*, 55 F.3d at 1005. Under Texas law, a defendant is entitled to a lesser-included-offense instruction only if the lesser crime is within the proof necessary to establish the charged offense. *See Solomon v. State*, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001). Also, the record must contain some evidence that would permit the jury to find the defendant guilty of only the lesser crime. *See id.* at 369. As Cantu accurately argues, the question is not whether "[t]he evidence was clearly sufficient to establish that [the defendant] participated in the murder," but "whether the evidence would permit a reasonable jury to make a contrary finding[.]" *Aguilar v. Dretke*, 428 F.3d 526, 531 (5th Cir. 2005).

Under Texas law, capital murder subsumes the lesser crimes of murder, kidnapping, and sexual assault. The Court must decide whether a rational jury would have acquitted Cantu of capital murder and convicted him of another offense because it found only his first statement credible. Cantu suggests:

> [D]oubts remain as to the reliability of Cantu's second statement. The record suggests that it was procured only after the police made it known to Cantu that others involved in the incident had implicated him. (24 RR 854-55, 860). Whether he simply wanted to close ranks with his friends, or perhaps believed that his admission would better serve him in the ensuing prosecution, it is possible that his first statement was a more accurate description of his role than the second.

(Doc. Entry No. 2 at 30.) Given that suggestion, Cantu claims that *Beck* entitled the jury to consider his conviction for crimes less serious than capital murder. A review of the circumstances leading to Cantu's two statements and the trial context as a whole prove that a rational jury would not have

---

[13]   (...continued)

avoided ruling on this argument, *see Foster v. Dretke*, 2006 WL 616980 (5th Cir. Mar. 13, 2006) (unpublished), and has unconditionally applied *Beck* to all inmates who have received a death sentence, the Court will apply *Beck* to Cantu's claim.

convicted Cantu of a lesser offense.

    *1.*      *Cantu's Statements to the Police*

    At trial, Cantu did not give the jury a strong reason to disbelieve his second statement. Trial testimony showed that the police took Cantu to the homicide division office after his arrest. Houston Police Department Officer Robert G. Parish informed Cantu of his constitutional rights. Tr. Vol. 22 at 569-72. Cantu gave Officer Parish an oral account of his acts on the night of the murders, which Officer Parish reduced to writing. Tr. Vol. 22 at 572-79. Cantu read the statement and, in the presence of two other police officers, signed it. Tr. Vol. 22 at 579, 596-98, 603-06. In his first statement, Cantu admitted to a limited role in kidnapping, raping, and robbing the two girls. His initial statement, however, he claimed that he did not join the other gang members as they murdered the two girls in the woods.

    Later, Houston Police Department Officer Roy Swainson compared Cantu's initial statement to his interview of Fransisco Sandoval and the statement taken from O'Brien. Tr. Vol. 24 at 854. At trial, Officer Swainson testified that, "[b]ased on the statements that [they] had obtained, it appeared as if maybe there was a possibility [Cantu] didn't reveal his total involvement." Tr. Vol. 24 at 854. Officer Swainson decided to interview Cantu again. Cantu was again informed of and waived his rights. Tr. Vol. 24 at 857-60. At trial, Officer Swainson testified about the circumstances that led to Cantu's second statement:

| Officer Swainson: | I informed him that I had reviewed his earlier statement and that I had read Sean O'Brien's statement and I looked at them and I thought, there is a possibility that you left out a few details, and before I could actually almost finish that response he boastfully declares: We killed the girls. |
|---|---|
|  | Just like that nonchalantly, we killed the girls. |

Tr. Vol. 24 at 860.  Officer Swainson "[a]sked him if he [would] like to continue, put it in writing. If you're willing to put it in writing.  He said yeah." Tr. Vol. 24 at 860.  Officer Swainson again informed Cantu of his rights.  Tr. Vol. 24 at 863-66, 917-18.  He then transcribed a detailed second statement in which Cantu confessed to his role in the actual murder of the two girls.  Cantu read and signed the second statement, again in the presence of two other officers.  Tr. Vol. 24 at 868-69, 902, 920-21.  The State concluded its case by publishing the second statement to the jury.  Tr. Vol. 24 at 929-24; SX 5 and 6.  Cantu argued that Officer Swainson manufactured the second statement, but provided no testimony to support that assertion.

> 2.     *Application of Beck to Cantu's Trial*

Cantu's *Beck* claim depends on the jury believing that his first statement represented the only valid account of the crime, to the exclusion of his second statement and all additional trial testimony. Regardless of whether a rational jury would disbelieve Cantu's second statement, nothing in the record supports a lesser-included-offense instruction for simple murder.  Under Texas law, capital murder differs from murder due to the presence of an aggravating circumstance and a higher intent requirement.  *Compare* TEX. PENAL CODE § 19.03(a) (capital murder) *with* TEX. PENAL CODE § 19.02 (murder).  As the Court of Criminal Appeals observed: "For a rational jury to find that appellant was guilty only of murder, some evidence must exist in the record that appellant did not commit sexual assault, robbery, or kidnapping or did not kill during the commission of or in the immediate flight from committing any of these offenses." *Cantu*, 939 S.W.2d at 647.  If the jury believed Cantu's first statement, as he argues on federal review, then he would have confessed to the underlying offenses that would make his a capital crime.  Cantu also makes no argument that his actions in participating in the murder did not rise to the level of "intentional" *mens rea* required for

30

a capital murder conviction.  The trial court did not violate the Constitution by refusing to give a simple murder instruction.

With respect to the lesser offenses of kidnapping or sexual assault, Cantu's depends on the jury viewing significant evidence with a heavy dose of skepticism.  The record does not prove that a rational jury would have believed only the account Cantu gave in his first statement.  Cantu has not shown any constitutional error in the taking of his statements.  Cantu filed a motion to suppress his statements.  Clerk's Record at 100-02.  Cantu's motion alleged that his statements were not voluntary because they were "the result of the promises and other coercive actions of law enforcement officers," taken without proper warnings or an adequate arrest warrant, and after Cantu exerted his right to remain silent.  The trial court held a suppression hearing.  Cantu did not testify or call any witnesses.   The State called police officers whose testimony did not reveal any constitutional or statutory violation in the taking of Cantu's statements.  The trial court denied the motion to suppress.  Tr. Vol. 20 at 90; Clerk's Record at 104.

Nothing in the trial testimony seriously questioned the integrity of Cantu's statements, particularly his second one in which he provided a full account of his actions.  In closing arguments, trial counsel encouraged the jury to find that Officer Swainson manufactured Cantu's second statement. Tr. Vol. 24 at 966-67.  While Cantu now speculates that "he simply wanted to close ranks with his friends, or perhaps believed that his admission would better serve him in the ensuing prosecution," (Doc. Entry No. 2 at 30), he did not make those arguments before the jury.

Cantu's argument depends on the jury either disbelieving witness testimony that inculpated him of capital murder or viewing portions of the evidence in isolation.  Federal review of the propriety of lesser-included-offense instructions is not so limited.  "The Fifth Circuit's interpretation

of *Beck* requires a trial court judge to consider all of the evidence in the case as a whole in determining whether a rational jury could have found the defendant not guilty of capital murder but guilty of a lesser-included offense." *Campbell v. Dretke*, 117 F. App'x 946, 952 (5th Cir. 2004). "[I]t is not enough that an item of evidence viewed alone and unweighed against all the evidence supports" a lesser-included-offense instruction. *United States v. Branch*, 91 F.3d 699, 713 (5th Cir. 1996). The Fifth Circuit's interpretation of the *Beck* standard does not look at the evidence in a selective manner; "[t]he issue here is whether a rational juror, *given all the facts*, could have acquitted [a petitioner] of capital murder and convicted him of a lesser included offense." *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988) (emphasis added); *see also Ransom v. Johnson*, 126 F.3d 716, 726 (5th Cir. 1997); *United States v. Harrison*, 55 F.3d 163, 167 (5th Cir. 1995); *Montoya v. Collins*, 955 F.2d 279, 286 (5th Cir. 1992). "It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. Rather, there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted." *Dowthitt*, 230 F.3d at 757 (quotation omitted). A reviewing court must eschew "a contorted and irrational view of the evidence[.]" *Campbell*, 117 F. App'x at 953.

Even if the jury somehow believed only the story from his first statement, Cantu's second statement was not the only evidence showing that he participated in the murders. Persuasive trial testimony confirmed Cantu's role not only in the kidnapping and sexual assault, but in the murder of the girls. Fellow gang member Roman Sandoval described how the gang members encountered the two girls and dragged them off to be raped. Roman Sandoval testified that Cantu called him after the murders and essentially confessed to having raped and murdered the girls. Tr. Vol. 21 at 116-11. Other gang members confessed that they only participated because they were "just following

32

whatever Peter Cantu was doing." Tr. Vol. 21 at 120.

Fourteen-year-old gang member Venancio Medellin testified that, after he raped Ms. Ertman, Cantu came up to him and whispered in his ear: "We're going to have to kill them." Tr. Vol. 21 at 210, 257. Cantu then directed the gang to bring the girls into the woods. Tr. Vol. 21 at 212. Cantu himself escorted Ms. Ertman into the woods. Tr. Vol. 21 at 235. Villareal and O'Brien began choking the Ms. Ertman, first with their hands and then with a belt. Venancio Medellin could not see what the other gang members were doing with Ms. Pena because he left the wooded area before the girls died. Tr. Vol. 21 at 223-24. Cantu later gave Venancio Medellin a watch that belonged to Ms. Ertman. Tr. Vol. 21 at 227.

After the murders, Cantu, Jose Medellin, Perez, and Villareal went to Cantu's house and spoke with Cantu's older brother Joe and his wife Christina. Joe Cantu asked the group, who was giggling and laughing, what happened. Tr. Vol. 21 at 294, Vol. 22 at 394. Jose Medellin said that they "had a lot of fun and it should come out on the news." Tr. Vol. 21 at 294, Vol. 22 at 395. Christina Cantu took that to mean they killed someone. Tr. Vol. 21 at 294. Jose Medellin said that they killed "a couple of chicks." Tr. Vol. 22 at 396. When Perez went to shower and clean the blood off him, Jose Medellin began to describe the events of that evening. Tr. Vol. 21 at 298. Others joined in the narrative, "[l]ike they were proud of what they did. They were laughing and bragging about it." Tr. Vol. 21 at 299-300. Jose Medellin discontinued his narrative to bathe. Tr. Vol. 21 at 307-08. Cantu, who had been taking Venancio Medellin home, then returned and distributed money and jewelry he stole from the girls. Tr. Vol. 21 at 311. As the others described the rapes, Cantu "is just agreeing with them" with "a grin on his face." Tr. Vol. 21 at 320-21, Vol. 22 at 410, 418-19, 440.

When the gang members finished bragging about the rapes, Joe Cantu asked what happened to the girls. The gang members all said that they "had to kill" the girls. Tr. Vol. 21 at 323-24. The gang members described how they murdered the girls. Tr. Vol. 21 at 324-27. One gang member described how Cantu "kicked one of the girls in the face with his steel toe[ boots]" because she "wouldn't die." Tr. Vol. 21 at 327. Cantu himself stated: "The bitch wouldn't die so I stomped on her neck." Tr. Vol. 22 at 356. They then each took a turn "jumping on her neck." Tr. Vol. 21 at 327. The gang members said that both girls were "killed the same way . . . they jumped on their neck." Tr. Vol. 21 at 328. Cantu said the girls "had to die [so] they couldn't identify them." Tr. Vol. 22 at 360-61. Cantu's second statement fully harmonized with trial testimony.[14]

The review of proposed lesser-included-offense instructions requires the Court to ascertain how a rational juror would have considered the evidence presented at trial. The issue is not whether a juror, through rejecting some evidence or considering the factual scenario in a particular manner, conceivably could return a verdict for a lesser crime. This Court must decide whether, in light of the whole evidentiary picture, a rational juror would have acquitted the defendant of capital murder and found him guilty of another offense. Because a reasonable jury would find that Cantu's second statement fully agreed with the other overwhelming evidence against Cantu, the Court of Criminal

---

[14]    The Court of Criminal Appeals observed:

> For a rational jury to find that appellant was guilty *only* of sexual assault, robbery, or kidnapping, there must be some evidence in the record that appellant did not intend to kill the victim. However, no such evidence exists. As the evidence previously set out illustrates, appellant was the self-appointed leader of this "gang." His own statement to a co-defendant expressly showed that he intended that the girls be killed, and testimony as to appellant's actions revealed his active participation in the killings. A rational jury could not have found that appellant did not intend to kill the victim. [Accordingly,] appellant was not entitled to a charge on the lesser included offenses of sexual assault, robbery, or kidnapping.

*Cantu*, 939 S.W.2d at 647.

34

Appeals was not unreasonable in holding that the facts of this case did not entitle him to a lesser-included-offense instruction. Cantu has not shown that the state court's rejection of his *Beck* claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## D.     Ineffective Assistance of Counsel (claims ten through twelve)

Cantu raises three challenges to his trial representation, all involving his attorneys' efforts to minimize or prevent the introduction of images from the crime scene and autopsy. During the guilt/innocence phase of trial, the prosecution called police officers and crime scene investigators to describe the scene, the recovery of evidence, and the condition of the bodies when discovered. The prosecution supported this testimony with photographs (SX 48, 50-57) and a videotape (SX 49) depicting the crime scene and the victims' bodies. Outside the jury's presence, Cantu's trial attorneys objected to the material showing the victims' bodies. Trial counsel objected that the material violated TEX. R. EVID. 403 because "the photographs are inflammatory, they're highly prejudicial, they're unnecessary for the State to prove its case, and their prejudice far outweighs any probative value." Tr. Vol. 22 at 452-53. The prosecution explained why they sought to admit the photographs into evidence:

> [T]hey truly and accurately depict the scene as was observed by the police when they
> arrived upon the scene of this homicide.  These photographs, as well as all the
> photographs [the] State intends to introduce, will assist the State in proving its case
> in that they're going to prove up what witnesses have related that the defendants told
> them as to the manner and means that the death was caused to these girls, as to the
> manner and means that these women were sexually assaulted. The medical examiner
> will be able to explain why certain areas of the body are in terrible decomposition
> and why other areas are not, and the explanation is such that it explains what the
> defendants did say they did to these people, and it would corroborate not only what
> they told other witnesses whose credibility has come under attack, also corroborate
> their own confession when it comes in.  Supports that the police are not lying about
> that.  Police could not have known the significance of what all this was until later on
> in the investigation, so it's not that they couldn't make these confessions up. . . . I

35

> don't know whether they're going to attack the credibility of the confession, they
> already tried to suppress it, but it shows Peter Anthony Cantu said what he did to
> these two girls to various persons that he was telling them the truth.

Tr. Vol. 22 at 455. As required by Texas practice, the trial court conducted a balancing test before

allowing the allegedly inflammatory material into evidence. The trial judge stated:

> I want the record to reflect with regard to these photographs the court has admitted
> into evidence that the court has reviewed all of these photographs where bodies are
> depicted, and that the court had informed the State of Texas that unlike the usual case
> where the State offers every photograph and the court culls some out, that in this case
> the State of Texas was starting at zero and was going to have to establish the
> requirement to have any of these scene photographs entered, and that the State of
> Texas, with regards to the autopsy photographs, has been told that there are some
> fifty morgue photographs, morgue autopsy photographs of each girl, and that the
> State of Texas has culled out between eight and twelve of those photographs . . .
> [w]hich the court has reviewed. So I want the record to be perfectly clear that the
> court [has] absolutely performed a balancing test, likewise is allowing the State of
> Texas only to offer a minimal, b[are] minimum number of photographs of the bodies
> in order to establish the elements of their theory of what happened in this case.

Tr. Vol. 22 at 460-61. As the prosecution introduced the various exhibits into evidence, trial counsel

reurged their state-law objections.

The prosecution also used the allegedly inflammatory evidence to support testimony from:

(1) two dentists who identified the victims from dental records and (2) a Harris County Assistant

Medical Examiner who performed the autopsy. The state habeas court described that assistant

medical examiner's testimony in particular as follows:

> Marilyn Murr, Harris County Medical Examiner . . . testified that the photographs of
> the complainant's and Pena's bodies depict the extent of hemorrhaging in the genital
> areas, which was consistent with heavy blood flow from the repeated violent
> penetrations of the anus and vagina; that decomposition was much more advanced
> in the areas of the body that suffered severe trauma and blood flow; and, that the
> skeletal remains of the victims' heads, necks, and chest were consistent with
> strangulation and other forms of trauma.

State Habeas Record at 250-51. The prosecution introduced into evidence dental x-rays (SX 112,

36

146) and autopsy photos of the two victims to support the dental and medical examiners' testimony

proving that Cantu kicked Ms. Ertman in the mouth as she was dying and that the gang members

finished killing the girls by stomping on their neck (photographs of Elizabeth Pena: SX 113, 115-18,

120, 122-29, 142, 143, 149-51; photographs of Jennifer Ertman: SX 120, 133-34, 136-37, 139-43).

Again outside the presence of the jury, Cantu objected to the autopsy photographs (SX 113,

118, 120-29 and 149-52) under TEX. R. EVID. 403. Tr. Vol. 23 at 698-99. The state court overruled

the defense objection to most of the material. The state court, however, found that certain

photographs (SX 113, 114, 121, 131, 132, 135, 138, and 152) should not be admitted. Tr. Vol. 23

at 699-700. The trial court reviewed the other photographs, found that they were essential to explain

the medical examiner testimony, and discussed with the prosecution how to best present the

photographs without shocking the jury. Tr. Vol. 23 at 699-703.

Cantu raises three interrelated ineffective-assistance-of-counsel claims pertaining to the

introduction of crime scene and autopsy photographs and video. First, Cantu faults trial counsel for

not raising a federal due process objection in addition to his state law objection (claim ten). Second,

Cantu claims that his state appellate attorneys should have raised a due process claim on that basis

(claim eleven). Third, Cantu alleges that his trial attorneys should have objected when the

prosecution referred to the allegedly inflammatory material during closing arguments (claim twelve).

While in state and federal court Cantu has mentioned prejudice flowing from the crime-scene video,

his complaints have focused most strongly on the admission of allegedly prejudicial photographs.

The state habeas court rejected each of his complaints.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct

so undermined the proper functioning of the adversarial process that the trial cannot be relied on as

having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).   Under the *Strickland* standard, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003).   "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.   Under those standards, the Court will evaluate Cantu's ineffective-assistance-of-counsel claims.

1.   *Due Process Clause*

Cantu does not raise a separate claim that the Due Process Clause prohibited the introduction of the allegedly inflammatory photographs and video.   When he advanced his three ineffective-assistance-of-counsel claims on state habeas review, he anticipated that the state courts would find that he defaulted any actual due process claim by not making a contemporaneous objection at trial.[15] Accordingly, he cast his claims in the form of ineffective-assistance arguments.   A review of relevant due process protections informs this Court's review of whether trial counsel should have made a trial objection on that basis.

The state habeas court held that Cantu "fail[ed] to show that the admission of such autopsy and crime scene photos and crime scene video violated his due process rights[.]"   State Habeas Record at 260.   The admissibility of evidence is generally a matter of state evidentiary law.   Rule 403 of the Texas Rules of Criminal Evidence governs the admissibility of allegedly inflammatory photographs.   The Court of Criminal Appeals considers several factors in reviewing admissibility

---

[15]      The state habeas court indeed concluded that Cantu had procedurally defaulted any due process objection to the material.   State Habeas Record at 259.

of such photographs under Rule 403, including: "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed[, and] . . . the availability of other means of proof and the circumstances unique to each individual case[.]" *Long v. State*, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991). Photographs "must have some probative value [which is not] substantially outweighed by its inflammatory nature." *Id.* Here, the state habeas court found:

> The trial court . . . properly admitted such autopsy and crime scene photos and scene video based on the probative value of such evidence substantially outweighing its prejudicial value, in light of the number of exhibits offered in proportion to the number available, the size and details of such photos, and the circumstances unique to [Cantu's] case, i.e., the horrific brutality [Cantu] and his co-defendants imposed on [the victim] and Elizabeth Pena.

State Habeas Record at 259-60.

Federal due process concerns are not coextensive with state evidentiary rules. The Due Process Clause only provides relief from evidentiary rulings that are "so unduly prejudicial that it render[ed] the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). Here, this inquiry focuses not only on the inflammatory nature of the images but on their importance at trial. Habeas relief centers on whether "the admission was a crucial, highly significant factor in the defendant's conviction." *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).

This Court would have struck the balance differently in deciding whether to admit the challenged photographs. Nonetheless, it acknowledges that the United States Constitution does not require the prosecution to use the least-disturbing material available. The Fifth Circuit has held that graphic crime scene photographs do not offend due process principles when they "serve[ ] to illustrate and make more understandable the officers' testimony which described the [scene] and its

condition, and the location and condition of the deceased's body and the nature and extent of the injuries to the deceased." *Woods v. Johnson*, 75 F.3d 1017, 1039 (5th Cir. 1996). The prosecution introduced the allegedly inflammatory material while explaining the condition of the corpses, describing the process by which the police identified the girls' bodies, and verifying the statements made by Cantu and others. The state habeas court held that the photographs were "relevant concerning the [two girls'] injuries and their deaths." State Habeas Record at 259. Also, the state habeas court found that the probative value of the photographs outweighed any prejudicial effect. State Habeas Record at 259-60. Cantu has not shown that the admission of the challenged material was fundamentally unfair, particularly since the trial court clearly tried to filter out any unnecessarily disturbing material.

Even assuming it was error to admit the material, the Court cannot find that it was a crucial, highly significant factor in Cantu's conviction. Plentiful and detailed evidence demonstrated Cantu's culpability for capital murder. Additionally, the challenged material would not necessarily serve as a crucial or determinative factor in the jury's consideration of Cantu's punishment. While the disturbing photographs probably unsettled the jurors, the state courts would not be unreasonable in finding that the complex and textured case against Cantu was not unconstitutionally tainted by the material. The lack of a due process violation undercuts the ineffectiveness claims Cantu raises on federal habeas review.

    2.    *Failure to Make a Due Process Objection to the Allegedly Inflammatory Material*

Cantu faults his trial attorneys for not making a federal due process objection when the prosecution introduced the allegedly inflammatory material into evidence. One of Cantu's trial attorneys provided an affidavit in state court stating that his failure to raise a due process objection

at trial and on appeal was "simply an oversight[.]"  State Habeas Record at 203.  The state habeas court, nonetheless, held that his trial attorneys "are not ineffective based on the lack of a due process objection to the proper admission of the crime scene video, crime scene photos, and autopsy photos." State Habeas Record at 260.  Also, the state habeas court found that appellate counsel did not violate the Constitution by not attacking trial counsel's failure to object.  State Habeas Record at 261.  It is not likely that, having denied Cantu's objection under the Texas more-probative-than-prejudicial standard, the trial court would find that the challenged material rendered the trial fundamentally unfair under the Due Process Clause.  In light of the discussion above showing no due process violation, the state court could reasonably find that no *Strickland* deficient performance or prejudice flowed from trial and appellate counsel's failure to couple their arguments with a federal law objection.

Importantly, the state courts did not unreasonably find a lack of *Strickland* prejudice. *Strickland* only commands relief when an inmate shows a reasonable probability of a different result. The state court found that the trial court properly admitted the material, suggesting that any additional objection would have been fruitless.  While the challenged material explained what happened to the young girls, the evidence otherwise amply supported the elements of capital murder beyond a reasonable doubt.  Overwhelming evidence – coming from Cantu, fellow gang members, and those to whom they confessed their crime – inculpated Cantu in the capital murder.  Even without the photographs, trial testimony painted a vivid image of Cantu's brutality in killing the girls.  The state habeas court was not unreasonable in finding that the failure to object did not impact his sentence.  State Habeas Record at 261.  No reasonable probability of a different result would have occurred had trial or appellate counsel made an additional objection on due process grounds.  The

41

state habeas court's decision in that regard was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

>   3.      *Failure to Object to Prosecutorial Argument*

Cantu argues that trial counsel's performance violated the Constitution when counsel did not object during closing argument as the prosecution emphasized the crime scene photographs. The Court will review the context of closing argument to provide context to the allegedly objectionable prosecutorial statements. As Cantu's trial counsel Donald Davis concluded his closing argument, he begged the jury not to return a sentence that would result in his client's death:

> Peter Cantu is not an animal. The State can talk all day about what a horrible person he is and how these girls, those children, because that's what they were, they were children. Those children suffered a brutal killing. Well, this is a sanitized and civilized killing that we have for Peter Cantu. He is a child, he is eighteen, and that's what this is about. Are you going to kill him, because as we told you on voir dire he has a life sentence as soon as you find him guilty. Because we have this procedure set up, do we kill our children? Do we kill our children when you know they needed help, when you know there are problems? If there is an alternative, and we have suggested that there is, just life in prison, and Mr. Morrow and Mr. Smyth asked Mr. Marquart several times concerning someone is in prison for the next thirty-five years of his or her life, will that person be as likely to commit the crimes after thirty-five calendar years, and the answer is no. There is an alternative. Don't kill that child. He had problems, he was sick, he is sick. Spare his life, please, ladies and gentlemen of the jury. Please spare his life. Thank you.

Tr. Vol. 28 at 768-69. Trial counsel Robert Morrow also closed by encouraging the jury not to "follow death with more death[.]" Tr. Vol. 28 at 783.

The prosecution's closing argument responded to the argument that Cantu was a child who should not be killed: "The State has brought to you a lot of evidence to show you what this defendant is like, who he really is. He is not an eighteen year old child that didn't know what he was

doing." Tr. Vol. 28 at 785.[16] The prosecution's argument then turned to what Cantu had done that merited a death sentence. The prosecutor gave a detailed recapitulation of Cantu's confession, mentioning each violent act Cantu committed against the two girls. Tr. Vol. 28 at 786-87. The prosecution closed with the following statement that Cantu complains was inflammatory but went unchallenged by his trial attorneys:

> And if you care to, *you can see the result of this defendant's handy work again*. Open it up, look at it. I'm not going to show it to you. *I suspect that it's something that you will never ever forget if you never see these photos again, but if you want to see, if you want to start thinking about don't kill that child, don't kill that child, think about the two children in here that all you got left of them is right here.*

Tr. Vol. 28 at 787 (emphasis added). The prosecutor then continued describing in grisly detail how Cantu participated in killing the girls, culminating in the statement: "He is not a child, he [has] made choices. He has made choices all his life and his choices have put him in that chair right there, right before you, and he is being called to account now. It's his choice. He wants you . . . [not to] kill this child." Tr. Vol. 28 at 790. After the prosecution reviewed other violent acts from Cantu's life, the closing argument returned to a comparison between Cantu and the victims:

> Think about how cold the man is, how cowardly he is, how cruel he is. Think about the ordeal of those two young girls right here. How they were mutilated, brutalized for perhaps as much as an hour. You know what damage was done to their bodies. Think about how their death was not instantaneous. . . . Cold, cruel, inhuman, and yet he has his attorney saying don't kill this child. Do you think that if Mr. Ertman or Mr. Pena or Mrs. Ertman or Mrs. Pena had come on up on the scene and said to Peter and his gang don't kill that child, don't kill that child, would he have listened? No, not in the least. They didn't have the luxury of having anybody intervene for

---

[16]    Cantu "concedes that the argument was responsive, but not that it was invited." (Doc. Entry No. 13 at 10.) "[T]he idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole." *Darden*, 477 U.S. at 182. The prosecution's comment in this regard asked the jury to weigh Cantu's fate against that which he delivered to the victims: "[W]hen you consider the defendant and you hear all the facts and circumstances . . . why don't you also think in terms of maybe what these girls were thinking about, what their hopes and dreams were, what their wishes were[.] . . . [T]here is no reason to show any mercy to this man because you know what kind of a person he is and how much mercy and compassion he has in him." Tr. Vol. 28 at 758, 760.

> them, and he wants you to don't kill this child.  Look at the evidence.  Very brutal,
> very slow, tortured, a senseless killing.  Done purely to prevent him [from] being
> caught for the crimes that he had done.

Tr. Vol. 28 at 799-800.  On that basis, the prosecution asked the jury to assess Texas' special issues

in a manner that would result in a death sentence.

Cantu argues that his trial attorneys should have objected to the prosecution's encouragement

to look at the allegedly inflammatory photographs as his "handy work" when weighing his fate.

Cantu alleges that the prosecutors comments were unconstitutional because "the prosecuting attorney

made reference to the photographs in his closing only to emphasize the horror of death and decay[.]"

(Doc. Entry No. 13 at 10.)  Cantu contends that "it cannot rationally be thought that the argument

was anything at all but an appeal to the emotions of the jurors and a distraction from the gravity of

the rational decision they were called upon to make."  (Doc. Entry No. 13 at 11.)  "[T]he images of

decomposition and maggot infestation were clearly intended only to arouse, and undoubtedly did

arouse, such anger and disgust in the jurors that they were unlikely to acquit Cantu under any

circumstances, even if they believed him to be, or had a doubt whether he might be, guilty of some

offense other than capital murder."  (Doc. Entry No. 13 at 13.)[17]

Under Texas state law, "proper jury argument must fall within one of the following

categories: (1) summary of the evidence; (2) reasonable deduction from the evidence; (3) in response

to argument of opposing counsel; and (4) plea for law enforcement."  *Borjan v. State*, 787 S.W.2d

53, 55 (Tex. Crim. App. 1990).  The state habeas court concluded that the allegedly inflammatory

---

[17]      The Due Process Clause protects against prosecutorial excess in closing summation.  *See Darden v.
Wainwright*, 477 U.S. 168, 180 (1986); *Caldwell v. Mississippi*, 472 U.S. 320, 337-38 (1985); *Rogers v. Lynaugh*, 848
F.2d 606, 608 (5th Cir. 1988).  "The due process clause of the Fourteenth Amendment provides an independent check
on a prosecutor's comments that 'so infected the trial with unfairness as to make the resulting conviction [or sentence]
a denial of due process.'"  *Ries v. Quarterman*, 522 F.3d 517, 530 (5th Cir. 2008) (quoting *Rogers*, 848 F.2d at 608).
Cantu does not challenge the prosecutor's statements as a separate due process challenge.

statements were not made in error because they "properly summarized the evidence of the circumstances of the offense, made a reasonable inference that the jury would likely never forget those images, and properly presented a plea for law enforcement by urging the jury to 'think about the two children in here that all you got left of them is right here.'" State Habeas Record at 260 (quoting Tr. Vol. 28 at 787). The state habeas court found that "the State's punishment argument referring to the admitted photographs and the injuries shown in such photographs is a summary of the evidence concerning the circumstances of the offense and the complainant's and Elizabeth Pena's resulting injuries, and such argument is a reasonable inference that such photographs are unforgettable to the jury." State Habeas Record at 252.

In the alternative, the state habeas court essentially considered whether the challenged comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The state habeas court concluded that the prosecutor's statements were not "extreme or manifestly improper or inject[ed] new and harmful facts into the trial, in light of the record as a whole." State Habeas Record at 261. In light of those conclusions, the state habeas court held that Cantu "fail[ed] to show that trial counsel are ineffective based on the lack of objection to the State's cited punishment[.]" State Habeas Record at 261.

"Courts have always taken into consideration the harm done by the defendant in imposing sentence[.]" *Payne*, 501 U.S. at 825. The *Payne* Court explicitly stated that the "State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to this

45

family." *See id.* at 825.  Here, Cantu's attorneys argued that, if he were to receive a death sentence, he, like the victims, would be killed.  Trial counsel compared the possible fate of his client to the death of the two victims.  Tr. Vol. 28 at 768-69.  The prosecution responded by comparing the legal process by which Cantu could receive a death sentence to the brutal murders.  In doing so, the prosecution referred to the challenged material, the admission of which the Court has already decided did not constitute a due process violation.  The state habeas court concluded that the prosecutorial comments were not "extreme or manifestly improper or inject[ed] new and harmful facts into the trial[.]" State Habeas Record at 261.  While the prosecutor's comments were undeniably harsh, and this Court likely would not have allowed them, the state habeas court was not unreasonable in finding that they did not render the trial fundamentally unfair, particularly since the reference was brief and in response to the defense's closing argument.  Cantu has not shown that trial counsel's failure to object amounted to *Strickland* deficient performance.

Even if trial counsel should have objected, the prosecutor's statements were only minor threads in a detailed mosaic that supported the jury's answers to the special issues.  The punishment phase evidence showed Cantu to be a violent young man, though the murders were of previously unknown level of violence.  The prosecution argued that Cantu eschewed opportunities for rehabilitation.  He extended his violent acts into the prison setting.  Without the prosecutorial argument, the jury would not be measurably less likely to impose a death sentence.  The argument and related visual images brought into focus testimony describing the degraded condition of the victims' bodies that was already vividly before the jury.  The state courts would not be unreasonable in finding that the result would not have been any different if his counsel had performed in the manner Cantu outlines on federal review.  The state courts were not unreasonable in finding that

46

Cantu did not meet *Strickland*'s prejudice prong.

The state habeas court could reasonably find that trial and appellate counsel's representation did not violate Cantu's constitutional rights. Habeas relief is not available on Cantu's ineffective-assistance-of-counsel claims. *See* 28 U.S.C. § 2254(d)(1).

## IV. CERTIFICATE OF APPEALABILITY

The AEDPA prevents appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED. R. APP. PRO. Rule 22(b). Cantu has not yet requested that this Court grant him a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Clear, binding precedent forecloses relief on Cantu's claims. Under the appropriate standard, Cantu has not shown that this Court should certify any issue for appellate consideration. This Court will not certify any issue for review by the Fifth Circuit.

## V. CONCLUSION

From one perspective, this case reflects all the reasons that the death penalty should be imposed. Without the slightest provocation, gang members assaulted, repeatedly raped, and brutally murdered two young girls. The victim's bodies were left to decompose in the summer heat. Witnesses described Peter Cantu as absolutely unremorseful about his prominent role in the soul-sickening crime.

As compelling a case as the facts present, the application of the law to these facts necessarily causes misgivings even to the most ardent proponents of the death penalty. Five individuals were

47

convicted of the assaults, rapes, and murders in five different trials. All were sentenced to die. The Supreme Court's subsequent decision in *Roper v. Simmons*, 543 U.S. 551 (2005), prohibited executions for crimes committed prior to a defendant's 18th birthday. Accordingly, two of the five defendants received, instead, life sentences. At the time of these crimes, Cantu was 28 days past his 18th birthday. In other words, there is a vast asymmetry in the punishments to be imposed, all because of nothing more substantive than a few weeks variation in birth dates.

Executing Cantu causes still further misgivings when viewed, not relative to his peers, but relative to his life prior to the unspeakable horror of this single evening. Although Cantu had been a continuing disciplinary problem, expelled from three schools and given to threats of violence, nothing about his life even began to approach the depravity of his conduct on June 24, 1993. Until then, Cantu had spent only a short time in jail. None of this is to excuse his past criminality nor to endorse the lenient punishments that were previously imposed. His history, however, might well permit the inference that Cantu's horrific, homicidal bestiality on the night of June 24th was aberrational and not proof that his life was beyond redemption. Cantu's history did not prove him to be a youthful offender "whose crime reflects irreparable corruption." *Simmons*, 543 U.S. at 573.

Many of Cantu's criminal actions were attributable to his youth, which "result[ed] in impetuous and ill-considered actions and decisions." *Id.* at 569 (quotation omitted). In addition to Cantu's youth, other influences upon his conduct during the night in question included heavy drinking and a ritual of gang initiation, circumstances that lend themselves to peer-driven recklessness and even madness. To be sure, other young men in similar circumstances would not have participated in cold-blooded murders. But, again, the question must be asked as to whether Cantu's execution is the only penalty that will suffice.

48

Still, the Court's task is not to substitute its judgment for that of the Texas state courts. Its only task is to determine whether the petitioner meets the extremely stringent standards for federal habeas corpus relief. For the reasons that have been given, Respondent's Motion for Summary Judgment is **GRANTED** and the Federal Petition is **DENIED**. This case is **DISMISSED WITH PREJUDICE**.

The Clerk will provide a copy to the parties.

**SIGNED** at Houston, Texas, on this 4th day of February 2009.

KEITH P. ELLISON
United States District Judge

49